IN THE UNITED STATES DISTRICT COURT **FILED**
FOR THE NORTHERN DISTRICT OF ALABAMA   97 MAR 11 PM 1:43
MIDDLE DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

CINDY S. PLEMONS,                          }
                                           }
    Plaintiff,                          }
                                           }          CIVIL ACTION NO.
    vs.                                 }
                                           }          CV-95-AR-3259-M
R.L. FASHIONS OF ALABAMA,                  }
INC.,                                      }
                                           }          **ENTERED**
    Defendant.                          }
                                                      MAR 11 1997

### MEMORANDUM OPINION

Defendant, R.L. Fashions of Alabama, Inc.,[1] moved for partial summary judgment in the above-entitled cause on plaintiff's Title VII, 42 U.S.C. 2000e-2 *et seq.,* claims of *quid pro quo* sexual harassment, hostile work environment, and constructive discharge. For the reasons set forth below, defendants' motion is due to be granted in part and denied in part. Defendant subsequently moved for summary judgment on plaintiff's Title VII retaliation claims. This subsequent motion for summary judgment is not yet under submission and therefore will not be addressed in this opinion. The pertinent facts of each claim are addressed in the relevant

---

[1]Pursuant to February 28, 1997 pretrial agreement the only "employer" and only defendant to the present action is R.L. Fashions of Alabama, Inc.

1

sections below.

## A. Summary Judgment Standard

Rule 56, F. R. Civ. P., states, in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

F. R. Civ. P. 56(c). As stated by the Eleventh Circuit, "[s]ummary judgment is appropriate where there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994). R.L. Fashions of Alabama, Inc., has moved for partial summary judgment in the present action on several grounds.

## B. Employer Liability

Plaintiff contends that her employer, R.L. Fashions of Alabama, Inc., should be directly liable for both her *quid pro quo* and hostile work environment claims. Employers are strictly, or directly, liable if an employee has been the victim of *quid pro quo* sexual harassment. On the other hand, "in the work environment case the plaintiff must prove that higher management knew or should have known of the sexual harassment before the employer may be held liable." *Henson v. City of Dundee*, 682 F.2d 897, 910 (11th Cir.

2

1982); *see also Brewer v. Petroleum Suppliers, Inc.*, 946 F. Supp. 926, 932 (N.D. Ala. 1996).   In a hostile environment context, employers are indirectly liable because the supervisor's harassing conduct is purely personal conduct, whereas in a *quid pro quo* context the supervisor acts as the employer when he attempts "to extort sexual considerations from an employee."   *Henson*, 682 F.2d at 910.

Plaintiff alleges, citing *Faragher v. City of Boca Raton*, 76 F.3d 1155 (11th Cir. 1996), *vacated by* 83 F.3d 1346 (11th Cir. 1996)(submitted for *en banc* rehearing), and *Moye v. Fleming*, 924 F. Supp. 1119 (1996), that in certain circumstances employers may be held directly liable for hostile work environment claims.   The Eleventh Circuit in *Faragher* noted the intra-circuit conflict between *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311 (11th Cir. 1989), that precludes strict liability in a hostile environment case, and *Vance v. Southern Bell Telephone and Telegraph, Co.*, 863 F.2d 1503 (11th Cir. 1989), *overruled other grounds, Harris v. Forklift Systems*, 510 U.S. 17, 114 S. Ct. 367 (1993); *Patterson, v. McLean Credit Union*, 491 U.S. 194, 109 S. Ct. 2363 (1989), that would allow direct liability if the harasser acted as the employer's agent.   Assuming that direct liability can

3

attach when a supervisor acts as an agent of the employer, this court is persuaded by the reasoning of *Brewer v. Petroleum Suppliers* which examined the *Faragher* reasoning, before that decision was vacated. *Brewer*, 946 F. Supp. at 933-34.

> Whether a harasser acts as an employer's agent involves common law principles, but the common law is not to be drawn from the law of the state in which the harassment occurs.  The Eleventh Circuit Court of Appeals has stated that central to the inquiry of whether a harasser acts as an employer's agent is whether the harasser is acting within the scope of employment while harassing the employee. In *Faragher,* the Court of Appeals listed several factors to direct this inquiry, such as "the supervisor's direct authority over the plaintiff, the overall structure of the workplace, and the relative positions of the parties."  However, these factors are not determinative of whether the actions took place within the scope of employment. <u>An act of harassment by a supervisor who has substantial authority over an employee in a company with little official policy on harassment will still fail to be within the scope of employment if the harassment does not occur as part of the company's policy for encouraging or discouraging employee behavior, for increasing productivity, or for accomplishing other of the company's goals.</u>

*Id.* (emphasis added). There is no evidence the alleged conduct of Ray Amberson("Amberson"), plaintiff's supervisor and the alleged harasser, was part of any corporate scheme, good or bad, relating to employment.  He therefore was not acting as an agent for defendant when he allegedly harassed plaintiff. *See id.*  Amberson's alleged actions were purely personal. Accordingly, defendant cannot

4

be directly liable for plaintiff's sexual harassment claim. Instead, plaintiff must show that defendant knew or should have known about the alleged harassment and that defendant failed to take adequate remedial measures in remedying the situation.

### C. *Quid Pro Quo* Harassment

Defendant will be strictly liable if Amberson engaged in *quid pro quo* sexual harassment. Plaintiff's allegations of *quid pro quo* harassment arise solely from the following two incidents. In April 1993, plaintiff traveled to Arizona for an interview with a Ralph Lauren retail store. This interview was arranged by Howard Shapiro, Director of Human Resources for defendant. Plaintiff's husband was studying aviation in Arizona and plaintiff desired to move herself and her seventeen year old daughter to Arizona to be with him. The interview was quite a success and plaintiff was "hired on the spot." The Arizona Ralph Lauren Retail manager who interviewed plaintiff wanted plaintiff to start right away, but because plaintiff's daughter needed to finish her school year, a June, 1993 start date was agreed to. According to plaintiff, she was biding time until the move, and "everyone" in the Boaz, Alabama Ralph Lauren store (the "Boaz store" or "Boaz Ralph Lauren Store"), the site of the alleged harassment where plaintiff worked at all times relevant to this action, including Amberson and Ken Fraser

5

("Fraser"), defendant's district manager, was aware that plaintiff was leaving.[2]  Approximately two weeks after the interview, the Arizona store contacted Amberson regarding plaintiff.  Amberson gave plaintiff a good review and recommendation. Amberson then informed plaintiff of his magnanimity and told plaintiff "so, now, what are you going to do for me in return." (Pl. Depo. at 357). Plaintiff replied that "[she] wasn't going to do anything for him in return." Id.

The second incident involved an allegedly unapproved vacation taken by plaintiff.  Plaintiff says she had permission to take the vacation while Amberson claimed it to be unauthorized.  When plaintiff returned from her trip on May 22, 1993, Amberson confronted her with a written reprimand. (Pl. Depo. at Def. Ex. 9). Plaintiff was apparently very proud of her theretofore unblemished record as an employee at the Boaz store and attempted to convince Amberson to simply file a "constructive criticism" instead of filing the formal reprimand. (Pl. Depo. at 383).  To that request, Amberson responded that "we could work out something that would be

---

[2]Plaintiff eventually decided to stay at the Boaz store when her husband returned to Alabama from Arizona. She never began work at the Arizona store.

6

beneficial to both of us."[3] (Pl. Depo. at 384). Plaintiff responded, "I can't do that, and you know it" or something to the effect that "I won't sleep with you." (Pl. Depo. at 384). Plaintiff refused to sign the reprimand and told Amberson that she would either resign or sign the reprimand on May 24, 1993. She then left in apparent hysterics.

"*Quid pro quo* sexual harassment occurs when an employer alters an employee's job conditions as a result of the employee's refusal to submit to sexual demands," *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1315 (11th Cir. 1989); *see also Virgo v. Riviera Beach Associates, Ltd.,* 30 F.3d 1350, 1362 (11th Cir. 1994), or "threatens to make decisions affecting the employment status of the employee . . . ." *Sparks v. Regional Medical Center Bd.,* 792 F. Supp. 735, 745 (N.D. Ala. 1992).

A *prima facie* case of *quid pro quo* harassment is shown when: (1) the employee is in a protected class; (2) the employee is subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; and (4) the employee's reaction to

---

[3]The exact wording of this conversation is disputed, as are many of the conversations at issue. In determining whether summary judgment is appropriate, the court has accepted the facts in the light most favorable to plaintiff. While the conversation's exact language is ambiguous regarding whether Amberson was indeed asking for sexual favors, the court finds that a reasonable jury could find that he was.

7

the unwelcome behavior affected tangible aspects of the employee's compensation, or terms, conditions or privileges of employment.

> The acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment in order to create liability under this theory of sexual harassment. 29 C.F.R. § 1604.11(a)(1) & (2) (1981). As in the typical disparate treatment case, the employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision.

*Henson*, 682 F.2d at 909; *see also Steele*, 867 F.2d at 1311 ("*Quid pro quo* sexual harassment occurs when an employer alters an employee's job conditions as a result of the employee's refusal to submit to sexual demands."); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1564 (11th Cir. 1987); 29 C.F.R. § 1604.11(a) (1997). Under this test, the first incident, relating to the job recommendation, fails to meet the *prima facie* case. Amberson had already given the good recommendation. He did not threaten to withdraw his recommendation nor did he threaten to affect plaintiff's employment in any way. The *quid* allegedly requested had no potential to affect any *quo*, and no reasonable person could have believed it did. Plaintiff was ready to move to another job, and Amberson, insofar as plaintiff knew at the time, could not affect her job in the future. Accordingly, as to plaintiff's *quid*

8

*pro quo* action based upon these facts, defendant's motion for summary judgment is due to be granted.

The second incident presents a more difficult problem. This court determines that viewing the facts in the light most favorable to plaintiff, she clearly meets the first three prongs of the *prima facie* test. The fourth prong presents a more perplexing problem. Defendant argues that because no tangible aspects of plaintiff's employment were actually affected that she cannot meet the fourth prong of the *quid pro quo prima facie* test. Defendant correctly asserts that the *prima facie* test for *quid pro quo* harassment differs from that of hostile work environment insofar as the *quid pro quo* test requires a <u>tangible</u> effect on some aspect of plaintiff's employment, whereas the hostile work environment test requires only that a "term, condition, or privilege" be affected. *See Henson*, 682 F.2d at 904, 909. Defendant claims, without offering evidence, that the reprimand had been previously approved by Ken Fraser and therefore that Amberson could not have revoked it. Consequently, it is argued, no condition of plaintiff's employment was affected as a result of her refusal to submit to alleged sexual demands. She would have been reprimanded whether or not she acquiesced. Furthermore, defendant argues that no other

9

tangible adverse effect occurred because of plaintiff's refusal to comply with Amberson's alleged sexual request.  Indeed, plaintiff admits as much. (Pl. Depo. at 471-73).  Plaintiff's very brief response to this contention is that Amberson's alleged sexual-proposition was intended to force plaintiff into submitting to a sexual encounter with Amberson in exchange for his not issuing the reprimand.  This, in and of itself, says plaintiff, tangibly affected her employment.

The question then becomes does the refusal to retract a reprimand that was appropriately issued constitute an action that tangibly affected the employment status of the employee or change an employee's condition of employment.[4]  In other words, the question becomes, is Title VII violated when a supervisor attempts to sexually blackmail an employee in exchange for getting that employee out of trouble. This court believes the answer is "yes." Amberson apparently had the power to issue or revoke reprimands that could have affected some tangible aspect, in terms of promotion, wage decisions, etc, of plaintiff's employment. One of the reasons that corporations are strictly liable for *quid pro quo*

---

[4]Plaintiff apparently agrees that this is the issue. "Based on Amberson's prior conduct, it was obvious to Plaintiff that Amberson was saying that if Plaintiff would consent to sex, Amberson would change or destroy the reprimand." (Pl. Response Brief at 15).

sexual harassment is that the supervisor, who has the power to "discipline" employees can potentially use this power to extort sexual benefits from an employee. *See Steele*, 867 F.2d at 1316 (quoting *Henson*, 682 F.2d at 910). In this vein, the reprimand itself, or the refusal to withdraw it, may have constituted a tangible job detriment. Accordingly, plaintiff has satisfied, though tenuously, her *prima facie* case.

Significant questions remain for the trier of fact including but not limited to: (1) did Amberson's comments rise to the level of requesting sexual favors at all; (2) did the refusal to submit to the request for sexual favors, if such favors were requested, deny plaintiff a job benefit or affect a tangible aspect of her employment. Viewing the evidence in the light most favorable to the plaintiff this court concludes that a reasonable jury might answer those questions in the affirmative. Accordingly, defendants motion for summary judgment on this issue is due to be denied.

### D. Sexual Harassment

Defendant does not attempt to argue that Amberson's actions do not constitute sexual harassment. Rather, it wisely argues that it did not initially know about the harassment, and that when it did find out, prompt remedial action was taken.

> To prove that an employer is indirectly liable for hostile work environment sexual harassment, an employee "must show that the employer knew or should have know of the harassment in question and failed to take prompt remedial action." *Henson v. City of Dundee,* 682 F.2d 897, 905 (11th Cir. 1982). "The employee can show that the employer had knowledge of the harassment by proving that she complained to higher management of the problem [actual notice] or by demonstrating that the harassment was so pervasive that an inference of constructive knowledge arises [constructive notice]." *Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900, 904 (11th Cir. 1988).

*Kilgore v. Thompson & Brock Management, Inc.,* 93 F.3d 752, 753-54 (11th Cir. 1996). If remedial action is taken by an employer it "must be 'reasonably likely to prevent the misconduct from recurring.'" *Id.* at 754 (citing *Guess v. Bethlem Steel Corp,* 913 F.2d 463, 465 (7th Cir. 1990)).

### 1. Constructive Knowledge

Plaintiff first argues that defendant, even it had no actual knowledge, had constructive knowledge of Amberson's alleged harassment, because the harassment was so "extremely extensive, and [because] so many employees were involved." *Splunge v. Shoney's Inc.,* 97 F.3d 488, 490 (11th cir. 1996). Plaintiff gives only superficial attention to this assertion, as she does in response to almost all of defendant's arguments. As far as the court can tell, plaintiff bases her argument on the assertion that her immediate

supervisor and Amberson's underling, Kim Sherrell ("Sherrell"),
forewarned her that Amberson "had a thing about younger women."[5]
However, none of plaintiff's private run-ins with Amberson nor his
rather crass statements in public rise to the level of "extremely
extensive" or "pervasive" such that defendant can be imputed with
constructive knowledge. As defendant notes, the public incidents
center around three events. In the first, Amberson placed his hand
on plaintiff's back.  This was seen by a fellow employee.  Second,
Amberson brought to work his wife's sonogram and commented that he
could tell it was his child because of the size of the child's
penis pictured on the sonogram.  Third, he told an employee that he
would buy a bed if another employee were lying on it.  Plaintiff
does not point to any other public events which would lead this
court to believe that the harassment was so pervasive that
defendant can be charged with constructive knowledge. The other
incidents of alleged harassment against plaintiff, including
Amberson pressing himself against plaintiff's back while he had an
erection, all occurred in private.  Defendant cannot be said to
have constructive knowledge of such incidents, that were unreported
and in which occurred in private.  Plaintiff did complain about

---

[5]Plaintiff was apparently younger than Amberson. The court notes that there
were other complaints by employees, made to varying levels of supervisors and
management, concerning Amberson.  None of these complainants has filed suit.

some of the events to Sherrell, Fraser and Shapiro.   Because no constructive knowledge has been demonstrated, the conversations plaintiff had with her supervisors, that may constitute actual knowledge, and will be examined below.

### 2. Actual Knowledge

### i. Pertinent Facts

Plaintiff alleged in her EEOC complaints that the alleged period of Amberson's harassment began in January 1993 and continued until May 22, 1993.   Plaintiff contends that she reported said harassment to Fraser, Sherrell and Shapiro and that even when plaintiff received said complaints nothing was done to ameliorate the situation.

Plaintiff allegedly complained to Fraser initially in January, 1993 or February 1993[6]. The only specific allegations that this court can find regarding what might have been related in this conversation include the following events: (1) in January 1993, Amberson hugged plaintiff during a conversation when she inquired into Amberson's domestic problems; (2) in February 1993, Amberson allegedly told plaintiff that he knew "it must be really hard on

---

[6]Plaintiff's affidavit says that she talked with Fraser initially in January 1993. Her deposition clearly states that the first time she spoke with Fraser, according to her, was in February 1993. Either way, the conversation reported was the same.

14

[plaintiff] with [her husband] being gone for such long periods at a time"--he then "proceeded to ask [plaintiff] how [she] manage[ed]" to go without sex for two to three months at a time and "volunteer[ed] his services," apparently for sex, if plaintiff ever needed them; and (3) in February 1993, Amberson reached across plaintiff's desk to get a stapler and his arm brushed up against plaintiff's breasts. Plaintiff allegedly told Amberson he was making her nervous and he responded that if she "couldn't stand the pressure [she] needed to be at home doing what [women] did best."

It was only after this last event that plaintiff apparently first approached Fraser. In response to plaintiff's complaints, Fraser told plaintiff that she should discuss her problem with Amberson and to try and resolve the problem amongst themselves. In March 1993, Amberson placed his hand on plaintiff's lower back and reported this incident to Fraser. Fraser again told plaintiff to confront Amberson with the problem.

Other incidents ensued. Amberson made comments about plaintiff wearing orange lipstick and about how much he like her wearing that lipstick. She allegedly mentioned this conversation to Sherrell though not to Fraser. In April 1993, Amberson allegedly sat down with plaintiff at lunch. Plaintiff got up to leave and Amberson allegedly asked her, "I'm not going to get any

15

where with you."   Plaintiff responded that Amberson would get
nowhere with her and that she was tired of his advances.   She
reported these events to Sherrell and later to Shapiro in June or
July 1993.   She never reported the problems to Fraser.

In May 1993, plaintiff made a remark regarding his wife's
sonogram described above.   Plaintiff reported this incident to
Fraser who apparently confronted Amberson about the incident.
Amberson allegedly became angry that plaintiff called Fraser and
told her not to call Fraser again.   On May 22, 1993, Amberson,
regarding plaintiff's disciplinary letter, told plaintiff, in
essence, that they could "work it out some other way."   This, it is
argued, was Amberson's request for sex in exchange for tearing up
her disciplinary letter.   Plaintiff related this incident to both
Shapiro and Fraser. Following a full investigation of this and
apparently one other incident relating to Amberson's behavior, he
was fired.

## ii. Legal Analysis

As an initial matter, Sherrell, defendant argues, was not
"higher management," and therefore her knowledge of the alleged
harassment cannot be imputed to defendant. One way plaintiff can
show that defendant had knowledge of the alleged harassment is "by
proving that she complained to higher management of the problem .

16

. . ." *Huddleston,* 845 F.2d at 904. In *Kilgore v. Thompson &*
*Brock Management Inc.*, 93 F.3d 752, 754 (11th Cir. 1996), the
Eleventh Circuit explained that complaints to an immediate
supervisor or manager do not necessarily constitute notice to
"higher management." This case show that merely because someone
has managerial or supervisory responsibilities does not mean that
they are part of higher management or that their knowledge can be
imputed to higher management. *Id.*

The present action is somewhat different. Defendant in the
present case provided an avenue by which a person confronted with
sexual harassment could appeal to higher management. Defendant's
employee handbook states: "Any employee with a complaint may call
the Director of Retail Human Resources who will conduct a
confidential investigation." A supplemental handbook entitled
"Standards of Conduct: Sexual Harassment" states: "Any employee
with a complaint should contact: [1] the immediate supervisor, [2]
the Vice President of Human Resources, or [3] the Company's General
Counsel."

Plaintiff was apparently told by Sherrell, her immediate
supervisor, to tell her of any problems plaintiff might have with
Amberson. Plaintiff, following this advice and following

17

defendant's own guidelines, reported the harassment to Sherrell. Defendant makes much of the facts that plaintiff claims to be aware that she could have reported her troubles to Shapiro, the Director of Human Resources, and chose not to do so, and that plaintiff disavowed having knowledge of the supplemental guidelines. Defendant, having adopted a route by which employees can contact "higher management," i.e. by telling their immediate supervisor of the alleged harassment, cannot now say that such an avenue is unavailable to plaintiff, especially if such a path of complaint was articulated to plaintiff by Sherrell. Accordingly, any information shared with Sherrell can be imputed to "higher management."

Defendant next argues that according to its corporate policy against sexual harassment, a policy that plaintiff concedes exists, once it found out about the harassment it took adequate measures to ensure that the harassment would not continue. The actions taken by defendant were two. First, Fraser told plaintiff to deal with the situation herself by confronting Amberson. Second, when the situation escalated, defendant conducted an investigation and fired Amberson. The initial events defendant considered to be trivial and not worthy of any greater remedial action than those in which defendant engaged.

18

This court disagrees.  Appropriate, prompt remedial action must be reasonable according to the facts and circumstances of a given case, but whatever the action, it must be likely to prevent the alleged conduct from recurring.  In arguing that Fraser's recommendation to plaintiff, that she confront Amberson with her problems, was reasonable, defendant cites *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 480-81 (7th Cir. 1996).  In *McKenzie*, the Seventh Circuit found the following:

> According to Ms. McKenzie's deposition, she complained to Ketchum, her supervisor, on October 19, 1990, of Croft's comments.  Ketchum initially responded by asking Croft to talk with Ms. McKenzie, in the hope that the two of them would "work things out."  However, Ketchum also reported Ms. McKenzie's complaint to his supervisor, Bill Favri. Within ten days a meeting was held to discuss Ms. McKenzie's complaint.  At that meeting, it was agreed that Croft would have no further contract with Ms. McKenzie and that a memo would be issued to all employees regarding IDOTs policy against sexual harassment. . . . Under these circumstances, we hold that IDOTs response was a reasonable one, given the gravity of the harassing conduct alleged by Ms. McKenzie; moreover, it was completely effective. Thus, even if Croft's comments rose to the level of being sexual harassment under the standard articulated in *Meritor* and *Harris*, the "prompt and remedial action: taken by IDOT prevents recovery by Ms. McKenzie on this claim.

*Id*. at 480-81 (emphasis added).  Defendant's explanation of that case stopped short of the underlined paragraph above. Management in *McKenzie*, did more than just tell the complainant to fix the

19

problem herself. Management reported the conduct to the appropriate personnel--there is no indication that Fraser contacted Shapiro, who defendant seems to argue was the only person who could alleviate this problem. In *McKenzie*, management held a meeting to discuss an appropriate solution. Nothing of the sort happened here.

The court though did read the entire *McKenzie* opinion. In that case the Seventh Circuit held that prompt and remedial action was taken only as an alternative holding. Its initial holding was that the acts complained of did not rise to the level of sexual harassment. This court finds the present controversy, up and until the time of the alleged *quid pro quo* harassment in this case, markedly similar to that in *McKenzie*. That court noted:

> [Title VII] protects the worker against conduct a reasonable person might find hostile or abusive. . . . Noting that this approach is not susceptible to a "mathematically precise" test, the Court held that the required determination can be made only by evaluating all the circumstances, including, "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the worker's performance." [*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22-24, 114 S. Ct. 367, 371 (1993). . . . [I]solated and innocuous incidents will not support a hostile work environment claim. *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446 (7th Cir. 1994). "Title VII is not directed against unpleasantness per se but only . . . against discrimination in the conditions of employment." *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir. 1994).

20

> Although Ms. McKenzie clearly established that she
> subjectively feared Croft [her supervisor] and perceived
> his comments toward her to be harassing, we cannot hold
> that those three comments amounted to sexual harassment
> under the standard set forth in *Meritor* and *Harris*. As
> the standard has been articulated by the Supreme Court,
> we are required to consider the alleged harassment from
> an objective perspective and ask whether a reasonable
> person would perceive his or her environment to be
> hostile or abusive. . . . In this case, Ms. McKenzie was
> the object of three sexually suggestive comments over a
> three month period. Although Croft's comments were most
> certainly offensive, we cannot hold that the frequency or
> severity of the comments rose to the level of
> "unreasonably intefer[ing]" with Ms. McKenzie's working
> environment. *Harris,* 510 U.S. at 22-24, 114 S. Ct. at
> 371.

*McKenzie*, 92 F.3d at 480.  Similarly in this case, several comments were made over several months some of which one might find offensive, i.e. the comment Amberson made about the sonogram, and some which one might not, i.e. his comment about plaintiff's lipstick.   Taken as a whole, and assuming defendant had constructive knowledge of everything that plaintiff related to Sherrell and others, the situation to which plaintiff was subjected did not objectively constitute a hostile work environment. Accordingly, defendant's motion for summary judgment on plaintiff's Title VII hostile work environment claim is due to be granted.   The only remaining incident of harassment, discussed above, is that of *quid pro* harassment.   The defendant acted immediately to ensure

21

that such harassment did not recur, by eventually firing Amberson after an investigation. Nevertheless, because defendant is strictly liable for Amberson's alleged *quid pro quo* harassments, that claim shall proceed.

### E. Constructive Discharge

"To prove constructive discharge, the employees must demonstrate that their working conditions were so intolerable that a reasonable person in their position would be compelled to resign." *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1996)(citing *Steele v. Offshore Shipbuilding Inc.*, 867 F.2d 1311, 1317 (11th Cir. 1989)). Plaintiff bases her constructive discharge claim solely on events following Amberson's dismissal from the Boaz store. Specifically, plaintiff claims that her constructive discharge claim rests on the fact that she received a written warning when she closed her store early in a condition that was allegedly below standard and because she was not promoted to assistant manager. Plaintiff's argument appears to be that she was "framed" in the incident relating to her written reprimand. Her opinion in this regard led her to believe that "her employer would fabricate criminal charges to get rid of her." (Pl. Response Brief at 7). Wanting to beat her employer to the punch,

22

she quit.

By no stretch of the imagination were the employment conditions that existed after Amberson was fired so vile, so harassing, or vexing as to cause plaintiff to be constructively discharged. The possibility that she might have been reprimanded improperly or even viciously--the latter of which the facts do not support--as an isolated incident can not allow this court to find that the conditions at the Boaz Ralph Lauren facility were "so intolerable that a reasonable person in [plaintiff's] position would be compelled to resign." Accordingly, plaintiff's claim for constructive discharge is due to be dismissed on defendant's Rule 56 motion.

A separate and appropriate order will be entered.

DONE this _11_ day of March, 1997.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT COURT

23